IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN SHIELDS, | ) | CASE NO. 1:17-cv-01631 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Brian Shields ("Plaintiff" or "Shields") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for child insurance benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision.  On remand, the Commissioner should provide further analysis with respect to the Step Two determination because the ALJ did not build a logical bridge connecting the evidence, including the opinions of the state agency reviewing psychologists that Shields did have medically determinable impairments, with his Step Two finding that Shields failed to demonstrate the existence of such an impairment.

## I.  Procedural History

On March 21, 2014, Shields protectively filed[1] an application for child insurance benefits based on his deceased father's earnings records.  Tr. 19, 58, 151-152.  Shields had filed an earlier application for supplemental security income on July 18, 2012.  Tr. 19.  That application was granted and Shields was receiving disability payments based on that application.  Tr. 19, 47.

In his child insurance benefits application, Shields alleged a disability onset date of September 2, 1979.  Tr. 151.  As explained by the Administrative Law Judge, "Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is 18 years or older and has a disability that began before attaining age 22 (20 CFR 404.350(a)(5))."  Tr. 19.  Shields turned 22 years of age on September 2, 1988.  Tr. 151.  Thus, he is required to demonstrate that his disability began prior to that date.  Tr. 20.

Shields alleged he was disabled due to affective and mood disorders and anxiety disorders.  Tr. 58, 65, 75, 83.  After initial denial by the state agency (Tr. 75-81) and denial upon reconsideration (Tr. 83-89), Shields requested a hearing (Tr. 90-91).  A hearing was held before Administrative Law Judge Jonathan Eliot ("ALJ") on March 9, 2016.  Tr. 28-57.

In his March 22, 2016, decision (Tr. 16-27), the ALJ determined that Shields had not been under a disability within the meaning of the Social Security Act from September 2, 1979, through September 1, 1988 (Tr. 19, 23).  Shields requested review of the ALJ's decision by the

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/22/2018).

2

Appeals Council.  Tr. 9, 147-150.  On June 19, 2017, the Appeals Council denied Shields'

request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Shields was born in 1966.  Tr. 36, 151.  At the time of the hearing, Shields was living

with his brother.  Tr. 36-37.  Shields did not complete high school but he obtained a GED in

1986.  Tr. 37-38, 48-49.  From September 1984 through September 1988, Shields worked for

only two weeks.  Tr. 38-39.  Shields worked at a marina as a laborer at the end of the boating

season so his tasks included covering electrical plates.  Tr. 39.  Shields' neighbor, who knew of

Shields' conditions, hired him to work at the marina.  Tr. 39.   Shields was not fired from the

position.  Tr. 39.  His work at the marina stopped because it was the end of the season.  Tr. 39.

### B.    School record evidence and medical evidence

In a disability report submitted by Shields as part of his child insurance benefits

application, Shields relayed that it was difficult to obtain records dated prior to 1988 but he had

obtained some school records, which included a report completed by his childhood psychiatrist.

Tr. 172.  Shields relayed that his childhood psychiatrist had retired and had not retained records

for his patients.  Tr. 172; *see also* Tr. 60 (noting that Dr. Madsen had been contacted and he

indicated his records were destroyed when he retired).

On January 13, 1982, Dr. Carl Madsen, Jr., M.D., completed a "Physician's Report on

Homebound Physically Handicapped Child" for the Painesville Township Local School District.

Tr. 200.  In that report, it was indicated that Shields had last attended school on January 5, 1982,

and was in the tenth grade.  Tr. 200.  Dr. Madsen was asked to provide an explanation of

Shields' handicapping condition.  Tr. 200.  In response, Dr. Madsen indicated that Shields had an

"emotional disorder with somatic component" that would preclude regular school attendance.
Tr. 200.  Dr. Madsen indicated that Shields would likely be unable to attend school through June
1982.  Tr. 200.  The school superintendent signed the form, indicating his approval (Tr. 200) and,
on January 20, 1982, Shields was approved for home tutoring (Tr. 191).

On October 11, 1982, Nancy H. Reynolds, a school psychologist with the Lake County
School District, Psychological Services, tested/evaluated Shields.  Tr. 199, 201-202.  Ms.
Reynolds noted that, due to Shields' problems with being in the school environment, the testing
was conducted at the board of education offices rather than at the high school.  Tr. 201.  Ms.
Reynolds observed that Shields was verbally spontaneous, cooperative and friendly; he worked
very quickly, making many careless errors; and he tended to answer questions with the first thing
that came to his mind instead of thinking through his answers.  Tr. 201.  Ms. Reynolds also noted
that Shields' mother brought him to the testing session and she was overly protective.  Tr. 201.
Ms. Reynolds indicated that Shields appeared to be "exceptionally quiet when in the presence of
his mother."  Tr. 201.

Shields explained that he had a serious problem and did not want to return to Riverside
High School because of many bad memories.  Tr. 202.  He was not really afraid of school or
learning or crowds but there was one individual in particular that made him very afraid.  Tr. 202.
Shields was unable to really talk about the cause of this problem but noted that it constantly ran
through his mind.  Tr. 202.  He did have a willingness to work on this problem.  Tr. 202.

Ms. Reynolds completed a severe behavior program descriptor checklist, noting that
Shields experienced severe and frequent problems with having constant physical "ailments,"
both real and imagined, being school-phobic, being withdrawn, having unfounded fears of

others, and having fear of crowds.  Tr. 199.  Also, Ms. Reynolds noted that Shields had severe but sporadic instances of trembles, chills, and cold hands.  Tr. 199.

Ms. Reynolds concluded that Shields was of average ability but was "unable" to attend school and learn more skills.  Tr. 202.  She noted that Shields was working with Dr. Madsen.  Tr. 202.  Other than noting that Shields had many problems for which Shields required help and that Shields was aware of, Ms. Reynolds indicated she was unable to comment further since she had not spent sufficient time with him.  Tr. 202.  She recommended a referral to the East Shore Center for possible placement in a regional program.  Tr. 202.

On November 2, 1982, Shields was tested by school psychologist Carolyn Shimskey at the East Shore Center to determine whether he was eligible for the Regional Severe Handicapped Program due to being "school phobic."  Tr. 186-190.  As part of the evaluation, Ms. Shimskey interviewed Mrs. Crellin, the school guidance counselor.  Tr. 187.  Mrs. Crellin described Shields problems as a phobia of school, explaining that Shields would develop illnesses so he could go home; he felt that other kids were out to get him; and he was withdrawn and unresponsive with his peers.  Tr. 187.  Mrs. Crellin indicated that Shields' communication with adults was fine.  Tr. 187.  Mrs. Crellin indicated that Shields did not have behavioral problems at school – he did not get angry even when told he could not go home.  Tr. 187.  Mrs. Crellin noted that Shields' mother was cooperative but enabled Shields to continue with his school phobic behavior. Tr. 187.

During Ms. Shimskey's evaluation, she observed that Shields joked with her and appeared to be at ease.  Tr. 187.  Ms. Shimskey reviewed Shields' past testing data.  Tr. 187, 188.  Ms. Shimskey observed no articulation errors or difficulties with speech.  Tr. 188.  Shields' gross motor skills were noted as a strength since he had participated in sports (football, track and

basketball) and his fine motor skills were adequate.  Tr. 188.  With the exception of Shields' obesity, his physical examination was within normal limits.  Tr. 188.  Shields reported liking motor cross and watching sports of television.  Tr. 188.  Shields indicated he worked with his father running a motorcycle accessory shop from their home.  Tr. 188.  Shields hoped to take over the business one day and relayed that his father was in agreement.  Tr. 188.  Shields reported that his problems at school were his nerves not his behavior.  Tr. 188.  He also indicated that visitors at home made him nervous.  Tr. 188.  Shields indicated that, if he had a choice, he would choose home instruction.  Tr. 189.  He reported getting upset when other students acted up and were not at school to learn.  Tr. 189.  Also, he did not like the large building or large class size.  Tr. 189.

Ms. Shimskey concluded that Shields' "behavior of school avoidance has had an adverse [e]ffect on his academic performance as it prevents him from attending and therefore, is also to a marked degree."  Tr. 189.  She indicated that the problem had been getting worse over time with the problem becoming acute during the prior school year and found that Shields was eligible for the Severe Behavior Handicapped Program.  Tr. 189.

On November 30, 1982, as part of Shields' IEP it was recommended that Shields be placed in a severe behavior handicap transition class.  Tr. 192-195, 197.

On September 16, 2013, Dr. Madsen authored a letter, stating "The medical disorder from which [Shields] has suffered continues to incapacitate him for fruitful participation in studies in the school classroom setting, in my opinion.  For this reason, tutoring for him is preferred and is what I advise."  Tr. 198.  On September 27, 1983, home tutoring was approved for Shields.  Tr. 195.

On June 14, 2010, when Shields was age 43, he saw Dr. Thomas Svete, M.D., at Signature Health, for a psychiatric evaluation due to increased agitation and increased auditory and visual hallucinations.  Tr. 215-217.  Also, Shields had become more aggressive towards his girlfriend.  Tr. 215.  And it was reported that Shields may have attempted suicide by an overdose and with his automobile.  Tr. 215.  Shields reported having problems with intrusive images since he was eight or nine years old.  Tr. 215.  The images were very upsetting and became more severe during his high school years and he was unable to concentrate, focus or attend school.  Tr. 215.  He was very agitated, suspicious and thought that people were talking about him or against him.  Tr. 215.  As a result, he ended up getting into many fights.  Tr. 215.  Shields was able to obtain a GED.  Tr. 215.  He indicated that he experienced disturbing images every two to four minutes, all day long, and experienced severe nausea in connection with the images.  Tr. 215. He reported that the described symptoms had been occurring for 20 years.  Tr. 215.  Shields indicated he received treatment from Dr. Madsen when he was 13 years old but he did not get any other treatment because he did not have health insurance after turning age 18.  Tr. 215. When he treated with Dr. Madsen, Shields had tried Adipen and Valium.  Tr. 215.  The Valium sedated him but did not stop the intrusive images.  Tr. 215.  Shields relayed that he had a prior concussion from riding his bicycle but indicated that the intrusive images predated that accident. Tr. 216.  Shields indicated he had not been able to maintain a job, in part, because of his symptoms.  Tr. 216.  On mental status examination, Dr. Svete observed no psychomotor agitation or retardation; he was cooperative and a good historian; his mood was somewhat irritable but mildly so and frustrated; his affect was reactive and appropriate; his speech was of a normal rate and tone; his thought process was coherent; and his cognition was grossly intact.  Tr. 216.  Dr. Svete also observed that Shields had "an unusual level of ability to be self observant."

Tr. 216.  Dr. Svete's diagnoses included psychosis, NOS provisional; rule out OCD; rule out atypical mood disorder; rule out temporal lobe epilepsy versus porphyria; and antisocial personality traits.  Tr. 216-217.  Dr. Svete recommended Risperdal, case management and individual counseling.  Tr. 217.

On March 17, 2014, Shields saw Erika Nathan, M.D., (Tr. 209-213), complaining of a history of psychological problems for 30 years (Tr. 209).  Shields indicated that his problems started after his head injury which occurred when he was in a bicycle accident.  Tr. 209.  Shields reported cutting/gouging himself with a fork since 1996 and he reported being paranoid and having disturbing hallucinations since he was 13 years old.  Tr. 209.  Shields reported that he was home schooled in the 10th and 11th grades and then obtained his GED.  Tr. 210.  He indicated he saw a psychiatrist when he was 13 years old.  Tr. 210.  Shields was living with his brother.  Tr. 210.  On mental status examination, Dr. Nathan observed that Shields' affect was anxious; his mood was depressed; his motor activity was a bit tense; he reported visual hallucinations; and his thought content was paranoid.  Tr. 211-212.  Otherwise, the mental status findings were normal.  Tr. 211-212.  Dr. Nathan diagnosed unspecified schizophrenia spectrum/psychotic disorder and rule out PTSD, bipolar disorder and OCD.  Tr. 213.  Dr. Nathan noted that Shields was at risk for harm to others because of his thoughts and images but the risk was lessened because they were "incongruent to him" and he had had the images and thoughts since he was a teenager and had not acted on them.  Tr. 213.  Dr. Nathan noted that Shields' brother has guns but locked them up.  Tr. 213.  Dr. Nathan intended to verify this information with Shields' brother.  Tr. 213.  Dr. Nathan recommended therapy and she prescribed Abilify and Depakote.  Tr. 213.

Shields returned to see Dr. Nathan for medication management in April and May of 2014. Tr. 205-207.  Shields reported that that Depakote caused his hallucinations to worsen.  Tr.  206. Shields was tolerating the Abilify with no worsening of his mood or psychosis.  Tr. 206.  During his May 21, 2014, medication management session, Shields reported that he was continuing to have all day, daily hallucinations.  Tr. 205.  Dr. Nathan increased the dosage of Shields' Abilify. Tr. 205.  During that session it was noted that Shields had the same girlfriend since 1989.  Tr. 205.  They had met in his father's motorcycle shop.  Tr. 205.

On July 15, 2014, state agency reviewing psychologist, Cindy Matyi, Ph.D., conducted a review of the records and concluded that Shields had one or more medically determinable impairment(s), i.e., anxiety disorders, but there was insufficient evidence to substantiate the presence of a listing level impairment.  Tr. 61.  Dr. Matyi also concluded that the evidence did "establish some psychological and behavioral difficulties that necessitated special education intervention.  However, the data are not sufficient to provide the basis for a disability determination."  Tr. 61.  Upon reconsideration, on September 19, 2014, state agency reviewing psychologist Tonnie Hoyle, Psy.D., conducted a review of the records and reached the same conclusions as Dr. Matyi.  Tr. 67-68.

Shields returned to Signature Health in May of 2015 and received treatment there for a few months.  Tr. 218-230, 257-268.  During a psychiatric evaluation with Dr. Svete, Shields complained of bad hallucinations, depression, anxiety and not sleeping.  Tr. 229.  Shields indicated that he dug his fingernails into his skin or cut into his skin with a fork to decrease his hallucinations.  Tr. 229.  Over the years, Shields had received support from his mother and friends.  Tr. 229.  For about 10 years he lived in an abandoned warehouse that was owned by a friend's father.  Tr. 229.  In July 2015, Dr. Svete prescribed Celexa and recommended that

Shields continue on Neurontin and engage in therapy/counseling.  Tr. 236.  In addition to seeing

Dr. Svete, Shields saw Carol Fox, a therapist at Signature Health.  Tr. 257-268.

## C.     Hearing testimony

### 1.     Plaintiff's testimony

Shields testified and was represented at the hearing.  Tr. 33-49.   The ALJ requested that

Shields generally limit his testimony to the four-year claim period of September 2, 1984,

(Shields' eighteenth birthday), to September 2, 1988, (Shields' twenty-second birthday).  Tr. 31-

32.

Shields indicated that, while he was in school, he had received treatment for his mental

conditions from Dr. Carl Madsen.  Tr. 40-41.  Shields saw Dr. Madsen twice each week.  Tr. 41.

He recalled trying various medications but could only remember the name of one medication –

Adapin.  Tr. 41-42.  Shields recalled undergoing some psychological testing while in school but

he did not have any inpatient hospitalizations and did not recall needing any emergency room

treatment for acute psychiatric symptoms during the claim period.  Tr. 42-43.

Shields indicated he was unable to work during the claim period because he "was a slave

to [his] bedroom."  Tr. 43.  He was afraid to go outside and had hallucinations, both audio and

visual.  Tr. 43.  Shields indicated that the hallucinations started even before the claim period.  Tr.

43.  In tenth grade, Shields started having problems going to school due to hallucinations and

delusions and anxiety associated with not knowing what was happening to him.  Tr. 43, 48.

Shields would see hallucinations on the walls and they would come at him and attack him.  Tr.

48.  He was also having problems with other kids at school.  Tr. 43-44.  There was one

individual in particular that Shields believed was threatening his life.  Tr. 44.  Shields could not

say whether the individual did in fact threaten his life or whether Shields imagined it because

Shields was unable to distinguish between what is real and what is not.  Tr. 44.  Shields tended to get along better with adults than other kids.  Tr. 44.

The ALJ inquired about Shields having worked with his father in his father's motorcycle accessory shop, which was referenced in a November 1982 psychological report that was prepared in connection with determining whether Shields was eligible for a regional severe handicap program and/or home schooling.  Tr. 44-45.  Shields did not recall having worked with his father.  Tr. 44.  He indicated he would go out and talk with his father but did not perform any work.  Tr. 44-45.

Shields explained that he was able to work for a short time at the end of the claim period at the marina even though it involved leaving his house because his neighbor had hired him; his neighbor's wife was a nurse; and they knew about the psychological troubles that Shields had throughout his life.  Tr. 46.  His neighbor wanted to give Shields an opportunity to try to fit into society.  Tr. 46.  While working at the marina, Shields did not have any physical confrontations with people; he was just in a shell and not comfortable around the people he was working with.  Tr. 46.  He was not fired.  Tr. 46.  He just was not comfortable at the job.  Tr. 46.

Shields was asked by his attorney about a bicycle accident that occurred in the early 1980s.  Tr. 47.  Shields explained that he was riding his bicycle and the front wheel came off and he went over the handlebars face first into the asphalt.  Tr. 47.  He was out of it for about two days and needed reconstructive facial surgeries.  Tr. 47.

Shields discussed using a bedroom fan to "keep the demons away from [him,]" indicating that the demons did not have "the power to be able to get at [him] as easily when the fan [was] running."  Tr. 47-48.  Shields used fans in this manner during the claim period and now.  Tr. 48.

11

He explained that he has used two fans.  Tr. 48.  His mother would stay in bed with him at night and blow on his face with a fan.  Tr. 48.

### 2.     Vocational expert's testimony

Vocational Expert Deborah Lee ("VE") testified at the hearing.[2]  Tr. 49-56.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

---

[2] Since Shields' challenges are unrelated to the VE testimony, the specifics of Ms. Lee's testimony are not recounted herein.

the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 22, 2016, decision, the ALJ made the following findings:[3]

1.    Shields was born on September 2, 1966, and he had not attained the age of 22 as of September 2, 1979, the alleged onset date.  Tr. 21.

2.    Shields had not engaged in substantial gainful activity from September 2, 1979, the alleged onset date through September 1, 1988.  Tr. 21-22.

3.    There were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment from September 2, 1979, through September 1, 1988.  Tr. 22-23.

4.    Shields had not been under a disability, as defined in the Social Security Act, from September 2, 1979, through September 1, 1988, the date Shields attained age 22.  Tr. 23-24.

---

[3] The ALJ's findings are summarized.

13

### V. Plaintiff's arguments

Shields argues that the ALJ's finding that Shields was not disabled at Step Two is not supported by substantial evidence.  Doc. 13, pp. 11-14.  Shields also argues that the ALJ erred by failing to call a medical expert per Social Security Ruling 83-20.  Doc. 13, pp. 14-17.

### VI. Law & Analysis

**A.  Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

14

decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

As explained by the Administrative Law Judge, "Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is 18 years or older and has a disability that began before attaining age 22 (20 CFR 404.350(a)(5))." Tr. 19.  The regulation cited by the ALJ states that a claimant is "entitled to child's benefits on the earnings record of an insured person who . . . has died if . . . [the claimant] [is] 18 years or older and [has] a disability that began before [he] became 22 years old[.]"  20 C.F.R. § 404.350(a)(5).  Shields turned 22 years of age on September 2, 1988.  Tr. 151.  Thus, he is required to demonstrate that his disability began prior September 2, 1988.  Tr. 20.

**B.  Reversal and remand is warranted for further analysis of the Commissioner's Step Two determination**

The ALJ decided Shields' case at Step Two.  Tr. 22-23.  He concluded that there were "no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment from September 2, 1979, through September 1, 1988."  Tr. 22, 23.  Therefore, the ALJ found that the record did "not demonstrate the existence of a severe impairment for the relevant period."  Tr. 23.

Shields argues that the ALJ's Step Two determination constitutes reversible error.  Doc. 13, pp. 11-14.  Shields contends that the ALJ's finding that there was no medically determinable impairment of alleged mood or anxiety disorder is not supported by the record.  Doc. 13, p. 12.  He argues that the evidence from Dr. Madsen and two school psychologists as well as his hearing testimony is sufficient medical evidence to overcome the *de minimis* Step Two hurdle to

establish that his claim that his disability started prior to age 22 was not "totally groundless." Doc. 13, pp. 11-14.

At Step Two, a claimant must show that he suffers from a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509,[4] or a combination of impairments that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii).   An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience).[5]  *Long v. Apfel*, 1 Fed. Appx. 326, 330-332 (6th Cir. 2001); 20 C.F.R § 404.1521(a) (eff. to March 26, 2017).

As set forth in the regulations, an impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."  20 C.F.R. § 404.1508 (eff. to March 26, 2017).   As further explained in SSR 96-4p, "[a] 'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by itself can establish the existence of such an impairment."  Social Security Ruling 96-4p, *Policy Interpretation Ruling Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations*, 1996 WL 374187, * 1.  Further, if a claimant cannot show the existence of a medically determinable impairment, he will be found not disabled at Step Two.  *Id.*  "An 'impairment' must result from anatomical, physiological, or psychological abnormalities that can be shown by medically

---

[4] The duration requirement provides that "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1529.

[5] Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b) (eff. to March 26, 2017).  Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting.  *Id.*

acceptable clinical and diagnostic techniques." *Id.*  Thus, "[i]n claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled" at Step Two.  *Id. at \** 2.

Thus, the burden is on a claimant at Step Two and, as explained by the Sixth Circuit, Step Two may be utilized to "screen out claims that are 'totally groundless' solely from a medical standpoint."  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).   However, as also explained by the Sixth Circuit, Step Two "has been construed as a *de minimis* hurdle in the disability determination process."  *Id.* at 862.

In this case, the ALJ reached the conclusion that there were "no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment from September 2, 1979, through September 1, 1988."  Tr. 22, 23.  However, the ALJ failed to build a logical bridge connecting the evidence with his result and a court "cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'"  *Fleischer*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) and relying on *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2014)).

For example, while the ALJ provided great weight to the state agency reviewing psychologists' statements that there was insufficient evidence to provide a basis for a disability determination,[6] the ALJ seemingly overlooked and/or failed to explain why he discounted their

---

[6] The Commissioner relies upon the state agency reviewing psychologists' opinions as a basis upon which the ALJ's Step Two determination should be found to be supported by substantial evidence.  Doc. 14, p. 12.

opinions that Shields did have one or more medically determinable impairments, i.e., anxiety disorders.  Tr. 23, 61, 67.

In addition, while the ALJ discussed the school record evidence and evidence from Dr. Madsen, he did not explain why this evidence fails to establish the existence of a medically determinable mental impairment.   The ALJ simply concluded in a summary fashion that "[t]here are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairement[.]"  Tr. 22-23.

The evidence from Dr. Madsen, who treated Shields prior to Shields reaching age 22, indicated that Shields suffered from an emotional disorder with somatic component (Tr. 200, January 13, 1982, physician's report) and that Shields had a medical disorder which incapacitated him from fruitful participation in a school setting (Tr. 198, September 16, 1983, letter).  Understanding that Dr. Madsen did not specifically label Shields' impairment a mood or anxiety disorder, he opined that Shields had an emotional disorder and opined that Shields' disorder had an impact on his functional abilities.  Tr. 22, 198, 200.

Without a more complete explanation as to why the evidence from Dr. Madsen coupled with the school records and state agency reviewing psychologists' opinions regarding the existence of a medically determinable impairment was insufficient to allow Shields to surpass the *de minimis* Step Two hurdle, the undersigned is unable to recommend that the Court affirm the Commissioner's decision.

## C.         Other issue

Shields also argues that the ALJ erred by failing to call a medical expert per Social Security Ruling 83-20.  Doc. 13, pp. 14-17.   Shields contends that there is no dispute that he is disabled but rather the dispute relates to when he became disabled.  Doc. 13, p. 14.  Shields

argues that the ALJ erred by not calling a medical expert to determine whether his medical impairments predated his 22nd birthday since his alleged onset date and date last worked are remote and adequate medical records are not available for the relevant period.  Doc. 13, pp. 16-17.  Since further analysis on remand at Step Two may impact whether or not a medical expert is required, Shields' additional argument is not addressed.[7]  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision for further analysis of the Commissioner's Step Two determination.

June 22, 2018

/s/ Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the

---

[7] Although the undersigned finds it unnecessary to address Shields' second argument at this juncture, the undersigned recommends that, on remand, the Commissioner consider whether a medical expert is advisable considering that, due to the passage of time, there is limited evidence in the record for the relevant time period,.

right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).